I remain Steve Mellon on behalf of the appellant Dan Purjes in this case, and may it continue to please the court. This case relates to the same ski resort in Vermont, but otherwise a separate set of issues. These cases were not related in any way in the lower court. So there were many different issues at trial. We limited this appeal to just two, and the one that I want to speak to is this issue we call quasi-estoppel. Now, this is pretty widely accepted throughout the federal system, and the specific rule that we see is you can't say one thing to the IRS, get a tax benefit from it, and then in a subsequent court proceeding take a contrary position. So the issue they're trying to have it both ways on is the ownership of 17 condominiums that were originally part of the resort. Now, the evidence This is only about Unit 603, though. That's correct. That's correct, which was the last remaining one. Most of these were The Plausteiner's unit, right? The units were all purchased by the Plausteiners in the early 90s at a foreclosure sale. And then they put them back into the corporation. Right. Well, they put them in their own name to retain bank financing at some point. And then most of the units were sold during the period 2002-2004. And even though these units were titled in their own name, no one disputes, they reported all of those sales as Section 1231 gains on the company's tax returns. Was 603 ever listed on a return? 603 was not because it was never — it was not sold. It was only the ones that were sold. But this was a group of condos in the same development. They were all treated the same way. They were referenced as a group in the company's financial statements, which also, by the way, treated the sales as sales of corporate property. There was an explanation of the financial statements that they had put these in their own name to obtain bank financing, but the line item in the financial statement shows sales of corporate property. So these — this was a closely held company. Defendant Susan Plostiner was the CFO who signed all these tax returns and reported these as Section 1231 gains of the company. Can I just ask you how — what was the time between the sale of Unit 603 and the other units? How much time lapsed between those? It was several years because all of them were sold in the 2002-2004 period. There was one unit left over, and then 2010 was when the Plostiners turned over control of the company, and 2012, I believe, is the sale of that final unit. So doesn't that make a difference? Why doesn't that make a difference? Well, because they had — they had all been part of the same group. There was no — there was no change. There was no transfer of ownership. There was no contract that took place. It was still pursuant to the same arrangement that had been in place all these years. And so basically, the argument we're making is they treated these as corporate property for purpose of getting a tax benefit on their sale. The specific tax benefit is you record it as a corporate sale. You now share any tax liability with the minority owners, as opposed to taking it on your personal return. And then when there's one left over at the end of the day and they're leaving, they say, oh, I guess we can take that with us because it's titled in our name. But they got the tax benefit with regard to the other ones, and now on the last one, they want to say, oh, no, no, this was our property all along. But then how did you record these 16 sales as corporate sales if the condos were yours all along? You can't just choose. At least, I don't think the IRS just lets you choose. One day it's a corporate asset. One day it's my asset. They were all part of the same development. So the — and it's clear that if these were company property, it would have violated the subordination agreement, the contract that's being sued on here, for them to take the proceeds themselves. Because the subordination agreement said — there was a loan from Mr. Purgis that took place back in 2000, I believe. And the subordination agreement said, if this loan goes into default, the company cannot repay any indebtedness to yourselves, the Plowsteiners, until that loan has been paid off to Mr. Purgis. And the district court found that that loan went into default in the fall of 2001, and it was never repaid. It's still not repaid today. So any repayment of indebtedness to themselves would have violated the subordination agreement. And that includes the mortgage that the company issued to them when they transferred these, when they took them out of the company's name and put them in their own name to get bank financing. And they have mortgages on them. But now they've repaid that mortgage somehow, and the subordination agreement says they shouldn't be able to do it. So their position at trial, where they say this was our personal property, actually differs from the tax returns in three different ways. The first, the simplest, is they said the condos were personal property when the tax returns had said, at least as to the other 16 condos, they were corporate. Number two, they said at trial, oh, what happened was we voluntarily contributed the proceeds of this to the company while — that's for the 16 — while they were in control. We just — yes, it was our personal sale, but we voluntarily turned over the proceeds, and that's why the company wound up with the money. But neither the tax returns or the financial statements reflected any such contribution. And then number three, with regard to the mortgage that they had on those units, they supposedly forgave the mortgage because the company got the money, but the tax returns didn't show any income from forgiveness. So they're truly trying to have it both ways by saying we get to keep — But this sounds like an argument to Judge Caproni at the end of the trial, rather than — I mean, we give some deference to her decisions, don't we, these factual issues? Well, the factual issues I don't think are in dispute with respect to this. The question is the legal applicability of the quasi-estoppel doctrine. And what Judge Caproni said is, well, the issue of ownership isn't necessarily the same as tax treatment, and I'm not going to reach the issue of whether they did this appropriately for purposes of the tax laws. But with great respect to Judge Caproni, we think that is the whole issue. Because once you've reported it as a corporate sale, right or wrong, you're bound by that. You can't then say, oh, well, actually, we fudged the tax treatment a little, and now we're going to take the position that these are personal property. You've committed yourself to that position. You've received a benefit. And now you're saying, well, there's one left over, so now we're going to go back to the fact that we hold title in it. Well, could the IRS now go back against the Plow-Steiners for the fudging? Well, we're not going to encourage them to do so, but whether the tax law or the tax law. No, well, I understand that. Part of the flip of that is, I mean, your argument that you can't have it both ways, but they may have to deal with the IRS on the first 11. Right. And I don't know if the time has passed for that. These sales happened over a decade ago. But once the doctrine, the quasi-estoppel, says once you've stopped from taking a contrary position, and they did receive the benefit, they've got it, and there's no indication that they're going to have to go back. Well, they've got it as to the others, but your argument is if they had sold this, then they would have had it as to this one. They would have taken it as to this one, so they're bound by what they've done with the others. Right. I think they want to pick and choose when it's corporate and when it's personal based on when it's, which of their benefits. Right. But back, so back to what Judge Droney was asking, didn't Judge Caproni in the district court sort this out at the time and say it didn't make it, you know, whatever they did with the others, that's not binding on them here? She did not make the fact we don't dispute her fact-finding with respect to this issue. We dispute her legal conclusion that it doesn't matter whether or not the tax treatment was appropriate. They have claimed the benefit of this tax treatment, appropriate or not, and therefore we think they're bound by that with respect to the 17th. All right. Thank you very much.  Ms. Cole, glad to have you back, too. Can I remain Carolyn Cole as well? Thank you again. Judge Caproni's findings and facts in order should be affirmed. I think that Mr. Mellon maybe didn't characterize the transactions as they really were. In 1993, the Plough Centers bought the resort at a foreclosure action, and they had purchased some condominiums. There were 17 units, as a matter of fact, not 16. In 1998, prior to Mr. Purgis coming on board, prior to Snowdance LLC being formed, they sold one of these condo units, 512, as well, just the way they did now. All of these condo units were transferred in their name. They had the deed. They held the deeds to these condo units. Since they were the majority owners, they sought to capitalize the resort any way they could. So what they did was they were able to take financing out on these and then donate the money to the corporation. Now, let me address one of the issues. Scalia, and obtain a tax benefit, excuse me, and obtain a tax benefit. I don't believe that's the case, Your Honor. In fact, the company retained. Now, let me explain why they did this this way. Now, they held this they held these in their name, and they allowed, in fact, in multiple references, and I could point them all out to you, the financial statement, the audited financial statements, which, by the way, Mr. Purgis got as a director every single year and never objected to this situation. The company was allowed to use, use. They didn't own the condos. They were allowed to use them for rental property, provided, however, that they pay all the expenses. Now they were in a rental pool. It was they were being rented, that's right. They were timeshare units, basically. Including all of them, all 17 of them, and then one got sold. And what happened in 2002 to 2004, some got sold. Now, the Plow-Steiners transferred the deed to the new owner. The Vermont transfer tax shows that the Plow-Steiners are the owners of this property transferring to the new owner. And what happened was, if the Plow-Steiners were to take the capital gains, they would have had to pay the capital gains, and then they would have donated less to the company. So let's just say the condo sold for $400,000 and they had to pay $20,000 in taxes. The resort would have only gotten $80,000. They wanted to give the most economical tax benefit to the company. The company suffered losses year after year, and this is why we are here, every single year, and those losses were able to offset any capital gains that might have needed to be paid. So, in fact, the company acted as though they sold the condominium unit, and they got the full benefit of the, let's just say, $100,000 without having to pay tax on it. The company got the benefit. There's no evidence that there was any. Sotomayor Because they were in a net loss position. That's correct. Every single year from basically its inception. And for that reason, they did that. They voluntarily contributed these because, number one, they were the majority owners, and number two, by noting it in the financial statements as a contribution, they would have diluted Mr. Purgis's membership share. They didn't want to dilute the other members. Otherwise, it would have, everybody, Mr. Purgis was well aware of this arrangement and never objected. The IRS never objected. The CPA, who has been counseling and helping them since, I don't know, 1993 to maybe the present, I don't know, but for over a decade, recommended this tax treatment as a perfectly legal way. I'm not a tax attorney, and I don't know that that's at issue here. But the fact is, is that while the condominium units of the other 16, I'm sorry, the 15 in 2002 and 2004 were recorded, Unit 603 was not. Unit 603 was not because in 2010, when the company dissolved basically and the Plowsteiners left, Snowdance LLC was no longer paying any expenses for this condominium unit. They weren't using it. They didn't want it. They didn't take any rent. They weren't in it. At that, in 2012, 10 years later, the Plowsteiners sold a piece of property that was deeded to them and them alone. And we know that legal title only passes with a deed. It doesn't pass with an oral promise, as Mr. Purgis would like to have said, they promised me this. Now, equitable stopple doesn't apply here, because equitable stopple only applies in the case where the Plowsteiners would have had to make a false representation to the IRS about Unit 603. What did they represent to the IRS about 603? They declared it on their own personal tax returns. They told the IRS that Unit 603 was theirs. Now, Judge Caproni rejected this extrapolation theory that doesn't seem to find any support in the law, that because these other units received a certain tax treatment, therefore, we should extrapolate that this could or should have or would have received the same tax treatment simply because they were purchased all at the same time in 1993. But for many years, the company paid expenses on Unit 603, right? They did. And deducted those. I assume that they did, yes. Right. Yeah. They were able to take the rental income as well as a result of paying those expenses. But in 2010, the company stopped paying the expenses. So, you know, the fact is, is that tax treatment reflects how a transaction is accounted for. It doesn't reflect the ownership interest in it. And all the documents that exist today in the record show that the Plowsteiners were the legal and equitable owners of all the condominiums, irrespective of the 1231 gain treatment, and that the only document that exists in the record that makes reference to the company's relationship to these condos is in the audited financial statements, which very specifically say that the company has the right to use these properties as rental income, provided that they pay the expenses. And when the company stopped paying expenses for 603, it stopped having a relationship with those condominiums. Are there any questions for the Court? I still have a minute. We could stop you before then, I guess, if we would. And we can ask questions afterwards. I have none. Judge? Thank you, Your Honor.